# In the United States Court of Federal Claims

## OFFICE OF SPECIAL MASTERS
### No. 08-307V
### (To be published)

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*
| | |
|---|---|
| HUSSEIN HASHI and | \* |
| SAFIA WEGED, parents | \* |
| of S.H., a minor, | \* |
| | \* |
| Petitioners, | \* |
| | \* |
| v. | \* |
| | \* |
| SECRETARY OF HEALTH AND | \* |
| HUMAN SERVICES, | \* |
| | \* |
| Respondent. | \* |
| | \* |

Filed: August 25, 2016

Autism; Decision on Attorneys'
Fees and Costs; Reasonable Basis;
Hourly Rates

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

*Elaine W. Sharp, Esq., Whitfield, Sharp & Sharp, Marblehead, MA, for Petitioners.*
*Heather L. Pearlman, Esq., U.S. Dept. of Justice, Washington, DC, for Respondent.*

## DECISION AWARDING ATTORNEYS' FEES AND COSTS

**HASTINGS,** *Special Master*.

In this case under the National Vaccine Injury Compensation Program (hereinafter "the Program"[1]), Petitioners seek, pursuant to 42 U.S.C. § 300aa-15(e)(1), an award for attorneys' fees and other costs incurred in attempting to obtain Program compensation. They seek a total amount of $30,771.25. After careful consideration, I have determined to grant the request in part, but to deny the greater part, because it was not reasonable for Petitioners to proceed further with this case after April of 2012.

---

[1] The applicable statutory provisions defining the Program are found at 42 U.S.C. § 300aa-10 et seq. (2012 ed.). Hereinafter, for ease of citation, all "§" references will be to 42 U.S.C. (2012 ed.). The statutory provisions defining the Program are also sometimes referred to as the "Vaccine Act."

# I

## BACKGROUND LAW CONCERNING ATTORNEYS' FEES AND COSTS AWARDS

### A. General

Special masters have the authority to award "reasonable" attorneys' fees and litigation costs in Vaccine Act cases. §300aa–15(e)(1). This is true even when a petitioner is unsuccessful on the merits of the case -- in such cases, a special master "may" award fees, if the petition was filed in good faith and with a reasonable basis. *Id.* (Of course, the statutory use of the term "may" also means that a special master may also, in his or her discretion, *decline* to award any attorneys' fees or costs to a petitioner whose case is unsuccessful on the merits. *Chuisano v. HHS*, 116 Fed. Cl. 276, 284-85 (2014). "The determination of the amount of reasonable attorneys' fees is within the special master's discretion." *Saxton v. HHS*, 3 F.3d 1517, 1520 (Fed. Cir. 1993); *see also Shaw v. HHS*, 609 F.3d 1372, 1377 (Fed. Cir. 2010).

Further, as to all aspects of a claim for attorneys' fees and costs, the burden is on the *petitioner* to demonstrate that the attorneys' fees claimed are "reasonable." *Sabella v. HHS,* 86 Fed. Cl. 201, 215 (2009); *Hensley v. Eckerhart,* 461 U.S. 424, 437 (1983); *Rupert v. HHS,* 52 Fed. Cl. 684, 686 (2002); *Wilcox v. HHS,* No. 90–991V, 1997 WL 101572, at *4 (Fed. Cl. Spec. Mstr. Feb. 14, 1997). The petitioner's burden of proof to demonstrate "reasonableness" applies equally to *costs* as well as attorneys' fees. *Perreira v. HHS,* 27 Fed. Cl. 29, 34 (1992), *aff'd,* 33 F.3d 1375 (Fed. Cir. 1994).

One test of the "reasonableness" of a fee or cost item is whether a hypothetical petitioner, who had to use his own resources to pay his attorney for Vaccine Act representation, would be willing to pay for such expenditure. *Riggins v. HHS*, No. 99–382V, 2009 WL 3319818, at *3 (Fed. Cl. Spec. Mstr. June 15, 2009), *aff'd by unpublished order* (Fed. Cl. Dec. 10, 2009), *aff'd,* 406 Fed. App'x 479 (Fed. Cir. 2011); *Sabella v. HHS,* No. 02–1627V, 2008 WL 4426040, at *28 (Fed. Cl. Spec. Mstr. Aug. 29, 2008), *aff'd in part and rev'd in part,* 86 Fed. Cl. 201 (2009). In this regard, the United States Court of Appeals for the Federal Circuit has noted that:

> [i]n the private sector, 'billing judgment' is an important component in fee setting. It is no less important here. Hours that are not properly billed to one's *client* also are not properly billed to one's *adversary* pursuant to statutory authority.

*Saxton*, 3 F.3d at 1521 (emphasis in original) (quoting *Hensley*, 461 U.S. at 433–34). Therefore, in assessing the number of hours reasonably expended by an attorney, the court must exclude those "hours that are excessive, redundant, or otherwise unnecessary, just as a lawyer in private practice ethically is obligated to exclude such hours from his fee submission." *Hensley*, 461 U.S. at 434; *see also Riggins*, 2009 WL 3319818, at *4.

The U.S. Court of Appeals for the Federal Circuit has also made clear that special masters may rely on their prior experience in making reasonable fee determinations, without conducting a line-by-line analysis of the fee bill, and are not required to rely on specific objections raised by respondent. *See Saxton*, 3 F.3d at 1521; *Sabella*, 86 Fed. Cl. 201, 209 (2009); *see also Wasson v. HHS*, 24 Cl. Ct. 482, 484, 486 (1991), *aff'd*, 988 F.2d 131 (Fed. Cir.

1993) (holding that, in determining a reasonable number of hours expended in any given case, a special master may rely on her experience with the Vaccine Act and its attorneys, without basing her decision on a line-by-line examination of the fee application).  A unanimous Supreme Court has articulated a similar holding:

> We emphasize, as we have before, that the determination of fees "should not result in a second major litigation." The fee applicant (whether a plaintiff or a defendant) must, of course, submit appropriate documentation to meet "the burden of establishing entitlement to an award."  But trial courts need not, and indeed should not, become green-eyeshade accountants.  The essential goal in shifting fees (to either party) is to do rough justice, not to achieve auditing perfection.  So trial courts may take into account their overall sense of a suit, and may use estimates in calculating and allocating an attorney's time.  And appellate courts must give substantial deference to these determinations, in light of "the district court's superior understanding of the litigation."  We can hardly think of a sphere of judicial decisionmaking in which appellate micromanagement has less to recommend it.

*Fox v. Vice*, 563 U.S. 826, 838 (2011) (internal citations omitted).

### B.  Reasonable basis

As noted above, even if a petitioner is unsuccessful in obtaining Vaccine Act compensation for an injury, a special master "may" award fees and costs. (§300aa–15(e)(1).)  Of course, as recently noted by Chief Judge Campbell-Smith, the statutory use of the term "may" means that a special master can also, in his or her discretion, *decline* to award any attorneys' fees or costs to a petitioner whose case is unsuccessful on the merits, if the special master does not find that an award is deserved under all the circumstances. *Chuisano v. HHS*, 116 Fed. Cl. 276, 285-286 (2014).  In practice, special masters have generally awarded fees, or declined to do so, based upon whether there was a "reasonable basis" for the claim advanced by the petitioners.

The statute and legislative history afford no guidance as to the precise meaning of "reasonable basis," and the case law is relatively scant.  The Chief Judge of this Court has explained that not all claims should be found to have a reasonable basis, and that whether a reasonable basis exists is determined by the "totality of the circumstances." *Chuisano v. HHS*, 116 Fed. Cl. at 285-286.  A special master has "discretion" in determining whether a reasonable basis existed. *Murphy v. HHS*, 30 Fed. Cl. 60, 61 (1993), *aff'd without opinion*, 48 F.3d 1236 (1995) (judge affirmed a denial of reasonable basis, noting that the determination concerning reasonable basis is reviewed under an "abuse of discretion" standard).  In other cases in which, as in *Murphy*, a judge affirmed a denial of reasonable basis, the court remarked that the special master's discretion is "wide" (*Pereira v. HHS*, 27 Fed. Cl. 29, 34 (1992)), and "very broad" (*Silva v. HHS*, 108 Fed. Cl. 401, 405 (2012)).  In fact, in *Silva*, the court remarked that it is "difficult to imagine a broader grant of authority and discretion." 108 Fed. Cl. at 405.

In a significant number of Vaccine Act cases, special masters have found that no reasonable basis existed either to file the case, or to prosecute it beyond a certain point.  In almost all of those instances, the petitioner either did not seek review, or the special master's finding concerning reasonable basis was upheld on review. *See, e.g., Somosot v. HHS*, No. 13-710V, 2014 WL 6536059 (Fed. Cl. Spec. Mstr. Oct. 31, 2014), *aff'd*, 120 Fed. Cl. 716 (2015);

*Chuisano v. HHS*, No. 07-452V, 2013 WL 6234660 (Fed. Cl. Spec. Mstr. Oct. 25, 2013), *aff'd*, 116 Fed. Cl. 276 (2014); *Cortez v. HHS*, No. 09-176V, 2014 WL 1604002 (Fed. Cl. Spec. Mstr. Mar. 26, 2014); *Silva v. HHS*, No. 10-101V, 2012 WL 2890452 (Fed. Cl. Spec. Mstr. June 22, 2012), *aff'd*, 108 Fed. Cl. 401 (2012); *Browning v. HHS*, No. 07-453V, 2010 WL 4359237 (Fed. Cl. Spec. Mstr. Sept. 27, 2010); *Brown v. HHS*, No. 99-539V, 2005 WL 1026713 (Fed. Cl. Spec. Mstr. Mar. 11, 2005); *Smith v. HHS*, No. 91-057V, 1992 WL 210999 (Cl. Ct. Spec. Mstr. Aug. 13, 1992); *Livingston v HHS*, No. 12-268V, 2015 WL 4397705 (Fed. Cl. Spec. Mstr. June 26, 2015); *Rydzewski v. HHS*, No. 99-571V, 2008 WL 382930 (Fed. Cl. Spec. Mstr. Jan. 29, 2008); *McCabe v. HHS*, No. 91-1540V, 1993 WL 135860 (Fed. Cl. Spec. Mstr. Apr. 15, 1993); *Stevens v. HHS*, No. 90-221V, 1992 WL 159520 (Cl. Ct. Spec. Mstr. June 9, 1992), *aff'd*, 996 F.2d 1236 (Fed. Cir. 1993)(unpublished); *Dews v. HHS*, No. 13-569V, 2015 WL 1779148 (Fed. Cl. Spec. Mstr. Mar. 30, 2015) (finding no reasonable basis in a case in which Ms. Sharp was counsel).

One key opinion of the United States Court of Appeals for the Federal Circuit, discussing the "reasonable basis" requirement in a Vaccine Act case, is *Perreira v. HHS*, 33 F. 3d 1375 (Fed. Cir. 1994). In *Perreira*, the special master concluded that the petitioners had a reasonable basis for *initially filing* the petition and for the first part of their prosecution of the case, but concluded that there was *no reasonable basis* for pursuing the case beyond the point when the Perreiras submitted an expert report, at which time the Perreiras' attorneys should have realized that their expert's theory was plainly deficient to demonstrate causation. 33 F.3d at 1376. The special master denied fees and costs for work performed after that point, in taking the case to an evidentiary hearing. *Id*. Both the Court of Federal Claims (27 Fed. Cl. 29 (1992)), and the Federal Circuit (33 F.3d at 1376-77) affirmed.

The Court of Federal Claims judge rejected the Perreiras' argument that they automatically passed the "reasonable basis" test because they were relying on an expert's report, finding that argument to be "unreasonable." 27 Fed. Cl. at 33-34. The judge found that under all the circumstances of the case, for the petitioners to take the case to an evidentiary hearing "with no support in the contemporaneous medical records," and with no "*reputable* medical opinion or scientific studies" (emphasis added) was also "unreasonable." *Id*. at 34.

The Federal Circuit agreed with the court below, observing that "counsel's duty to zealously represent their client does not relieve them of their duty to the court to avoid frivolous litigation." 33 F.3d. at 1377. The appellate court added that Congress did not intend that every claimant qualify for an attorneys' fee award "by merely having an expert state an unsupported opinion that the vaccine was the cause in-fact of the injury." *Id*. The court concluded that the special master did not err in determining that the Perreiras "no longer had a reasonable basis for claiming causation in-fact" after their expert report was filed. *Id*.

## II

## BACKGROUND: THE OMNIBUS AUTISM PROCEEDING ("OAP")

This case is one of more than 5,400 cases filed under the Program in which petitioners alleged that conditions known as "autism" or "autism spectrum disorders" ("ASD")[2] were caused by one or more vaccinations.  A special proceeding known as the Omnibus Autism Proceeding ("OAP") was developed to manage these cases within the Office of Special Masters ("OSM").[3] A detailed history of the controversy regarding vaccines and autism, along with a history of the development of the OAP, was set forth in the six entitlement decisions issued as "test cases" for two theories of causation litigated in the OAP (see cases cited below), and will only be summarized here.

A group called the Petitioners' Steering Committee ("PSC") was formed in 2002 by the many attorneys who represented Vaccine Act petitioners who raised autism-related claims.  About 180 attorneys participated in the PSC.  Their responsibility was to develop any available evidence indicating that vaccines could contribute to causing autism, and eventually present that evidence in a series of "test cases," exploring the issue of whether vaccines could cause autism, and, if so, in what circumstances.  Ultimately, the PSC selected groups of attorneys to present evidence in two different sets of "test cases" during many weeks of trial in 2007 and 2008.  In the six test cases, the PSC presented two separate theories concerning the causation of ASDs.  The first theory alleged that the *measles* portion of the measles, mumps, rubella ("MMR") vaccine could cause ASDs.  That theory was presented in three separate Program test cases during several weeks of trial in 2007.  The second theory alleged that the mercury contained in *thimerosal-containing vaccines* could directly affect an infant's brain, thereby substantially contributing to the causation of ASD.  That theory was presented in three additional test cases during several weeks of trial in 2008.

Decisions in each of the three test cases pertaining to the PSC's *first* theory rejected the petitioners' causation theories.  *Cedillo v. HHS*, No. 98-916V, 2009 WL 331968 (Fed. Cl. Spec. Mstr. Feb. 12, 2009) *aff'd*, 89 Fed. Cl. 158 (2009), *aff'd*, 617 F.3d 1328 (Fed. Cir. 2010); *Hazlehurst v. HHS*, No. 03-654V, 2009 WL 332306 (Fed. Cl. Spec. Mstr. Feb. 12, 2009), *aff'd*

[2]    "Autism Spectrum Disorder" is a *general* classification which as of 2010 included five different specific disorders: Autistic Disorder, Childhood Disintegrative Disorder, Asperger's Syndrome, Rett Syndrome, and Pervasive Developmental Disorder Not Otherwise Specified (PDD-NOS). *King v. HHS*, No. 03-584V, 2009 WL 892296 at *5 (Fed. Cl. Spec. Mstr. Feb. 12, 2010).  The term "autism" is often utilized to encompass *all* of the types of disorders falling within the autism spectrum. (*Id*.)  I recognize that since the OAP test cases, the consensus description of ASDs, contained now in the "DSM-V" as opposed to the prior "DSM-IV," revises the prior subcategories of ASD set forth in the first sentence of this footnote.  However, the DSM-V retains the same *general description* of ASDs.  An ASD is a serious form of neurodevelopmental disorder defined by a collection of symptoms and behaviors, including significant impairment of social interaction and language skills, and the presence of repetitive, stereotyped interests. *E.g.*, *Snyder v. HHS*, No. 01-162V, 2009 WL 332044, at *31 (Fed. Cl. Spec. Mstr. Feb. 12, 2009).

[3]    *See Autism General Order No. 1*, 2002 WL 31696785 (Fed. Cl. Spec. Mstr. July 3, 2002).

88 Fed. Cl. 473 (2009), *aff'd*, 604 F.3d 1343 (Fed. Cir. 2010); *Snyder v. HHS*, No. 01-162V, 2009 WL 332044 (Fed. Cl. Spec. Mstr. Feb. 12, 2009), *aff'd*, 88 Fed. Cl. 706 (2009).[4]  Decisions in each of the three "test cases" pertaining to the PSC's *second* theory also rejected the petitioners' causation theories, and the petitioners in each of those three cases chose not to appeal. *Dwyer v. HHS*, No. 03-1202V, 2010 WL 892250 (Fed. Cl. Spec. Mstr. Mar. 12, 2010); *King v. HHS*, No. 03-584V, 2010 WL 892296 (Fed. Cl. Spec. Mstr. Mar 12, 2010); *Mead v. HHS*, No. 03-215V, 2010 WL 892248 (Fed. Cl. Spec. Mstr. Mar. 12, 2010).

The "test case" decisions were comprehensive, analyzing in detail all of the evidence presented on both sides.  The three test case decisions concerning the PSC's *first* theory (concerning the MMR vaccine) totaled more than 600 pages of detailed analysis, and were solidly affirmed in many more pages of analysis in three different rulings by three different judges of the United States Court of Federal Claims, and in two rulings by two separate panels of the United States Court of Appeals for the Federal Circuit.  The three decisions by special masters concerning the PSC's *second* theory (concerning vaccinations containing the mercury-based preservative "thimerosal") were similarly comprehensive.

All told, the 11 lengthy written rulings by the special masters, the judges of the U.S. Court of Federal Claims, and the panels of the U.S. Court of Appeals for the Federal Circuit *unanimously rejected* the petitioners' claims, finding no persuasive evidence that either the MMR vaccine or thimerosal-containing vaccines could contribute in any way to the causation of autism.

Thus, the proceedings in the six "test cases" concluded in 2010.  Thereafter, the Petitioners in this case, and the petitioners in other cases within the OAP, were instructed to decide how to proceed with their own claims.  The vast majority of those autism petitioners elected either to withdraw their claims, or to request that the special master file a decision denying their claim on the written record, resulting in a decision rejecting the petitioner's claim for lack of support.  However, a small minority of the autism petitioners have elected to continue to pursue their cases, seeking other causation theories and/or other expert witnesses.  A number of such cases have gone to trial before a special master, and in the cases of this type decided thus far, all have resulted in *rejection* of petitioners' claims that vaccines played a role in causing their child's autism. *See, e.g.*, *Henderson v. HHS*, No. 09-616V, 2012 WL 5194060 (Fed. Cl. Spec. Mstr. Vowell Sept. 28, 2012) (autism not caused by pneumococcal vaccination); *Franklin v. HHS*, No. 99-855V, 2013 WL 3755954 (Fed. Cl. Spec. Mstr. Hastings May 16, 2013) (MMR and other vaccines found not to contribute to autism); *Coombs v. HHS*, No. 08-818V, 2014 WL 1677584 (Fed. Cl. Spec. Mstr. Hastings Apr. 8, 2014) (autism not caused by MMR or Varivax vaccines); *Long v. HHS*, No. 08-792V, 2015 WL 1011740 (Fed. Cl. Spec. Mstr. Hastings Feb. 19, 2015) (autism not caused by influenza vaccine); *Brook v. HHS*, No. 04-405V, 2015 WL 3799646 (Fed. Cl. Spec. Mstr. Hastings May 14, 2015) (autism not caused by MMR or Varivax vaccines); *Holt v. HHS*, No. 05-136V, 2015 WL 4381588 (Fed. Cl. Spec. Mstr. Vowell June 24, 2015) (autism not caused by hepatitis B vaccine); *Lehner v. HHS*, No. 08-554V, 2015 WL 5443461 (Fed. Cl. Spec. Mstr. Vowell July 22, 2015) (autism not caused by influenza vaccine); *Miller v. HHS*, No. 02-235V, 2015 WL 5456093 (Fed. Cl. Spec. Mstr. Vowell August 18, 2015) (ASD not caused by combination of vaccines); *Allen v HHS*, No. 02-1237V, 2015 WL 6160215

---

[4]     The petitioners in *Snyder* did not appeal the decision of the U.S. Court of Federal Claims.

(Fed. Cl. Spec. Mstr. Vowell Sept. 26, 2015) (autism not caused by MMR vaccination); *R.K. v. HHS*, No. 03-632V, 2015 WL 10936124 (Fed. Cl. Spec. Mstr. Vowell Sept. 28, 2015), *aff'd*, 125 Fed. Cl. 57 (2016) (autism not caused by influenza vaccine); *Hardy v. HHS*, No. 08-108V, 2015 WL 7732603 (Fed. Cl. Spec. Mstr. Hastings Nov. 3, 2015) (autism not caused by several vaccines); *Sturdivant v. HHS*, No. 07-788V, 2016 WL 552529 (Fed. Cl. Spec. Mstr. Hastings Jan. 21, 2016) (autism not caused by Hib and Prevnar vaccines); *R.V. v. HHS,* No. 08-504V, 2016 WL 3882519 (Fed. Cl. Spec. Mstr. Corcoran Feb. 19, 2016) (autism not caused by influenza vaccine), *aff'd*, 2016 WL 3647786 (Fed. Cl. June 2, 2016); *Murphy v. HHS*, No. 05-1063V, 2016 WL 3034047 (Fed. Cl. Spec. Mstr. Corcoran April 25, 2016) (autism not caused by DTaP or MMR vaccines), *aff'd*, (Aug. 15, 2016) (not yet published); *Cunningham v. HHS*, No. 13-483V (Fed. Cl. Spec. Mstr. Hastings Aug. 1, 2016) (not yet published).

In addition, some autism causation claims have been rejected *without trial*, at times over the petitioner's objection, in light of the failure of the petitioner to file plausible proof of vaccine-causation. *See, e.g., Waddell v. HHS*, No. 10-316V, 2012 WL 4829291 (Fed. Cl. Spec. Mstr. Campbell-Smith Sept. 19, 2012) (autism not caused by MMR vaccination); *Fester v. HHS*, No. 10-243V, 2016 WL 1745436 (Fed. Cl. Spec. Mstr. Dorsey April 7, 2016) (autism not caused by measles, mumps, rubella, and varicella (MMRV) vaccine); *Fresco v. HHS*, No. 06-469V, 2013 WL 364723 (Fed. Cl. Spec. Mstr. Vowell Jan. 7, 2013) (autism not caused by multiple vaccines); *Fesanco v. HHS*, No. 02-1770, 2010 WL 4955721 (Fed. Cl. Spec. Mstr. Hastings Nov. 9, 2010) (autism not caused by multiple vaccines); *Miller v. HHS*, No. 06-753V, 2012 WL 12507077 (Fed. Cl. Spec. Mstr. Hastings Sept. 25, 2012) (autism not caused by DTaP or MMR vaccines); *Blake v. HHS*, No. 03-31V, 2014 WL 2769979 (Fed. Cl. Spec. Mstr. Vowell May 21, 2014) (autism not caused by MMR vaccination); *Pietrucha v. HHS*, No. 00-269V, 2014 WL 4538058 (Fed. Cl. Spec. Mstr. Hastings Aug. 22, 2014) (autism not caused by multiple vaccines); *Bushnell v. HHS*, No. 02-1648, 2015 WL 4099824 (Fed. Cl. Spec. Mstr. Hastings June 12, 2015) (autism not caused by multiple vaccines); *Bokmuller v. HHS*, No. 08-573, 2015 WL 4467162 (Fed. Cl. Spec. Mstr. Hastings June 26, 2015) (autism not caused by multiple vaccines); *Canuto v. HHS*, No. 04-1128, 2015 WL 9854939 (Fed. Cl. Spec. Mstr. Hastings Dec. 18, 2015) (autism not caused by DTP and DTaP vaccines); *Valle v. HHS*, No. 02-220V, 2016 WL 2604782 (Fed. Cl. Spec. Mstr. Hastings April 13, 2016) (autism not caused by DTaP vaccine); *Hooker v. HHS*, 02-472V, 2016 WL 3456435 (Fed. Cl. Spec. Mstr. Hastings May 19, 2016) (autism not caused by multiple vaccines). Judges of this court have affirmed the practice of dismissal without trial in such cases. *E.g.*, *Fesanco v. HHS*, 99 Fed. Cl. 28 (2011) (Judge Braden affirming); *Canuto v. HHS*, No. 04-1128V, 2016 WL 2586510 (Fed. Cl. Apr. 18, 2016) (Judge Yock affirming).

In none of the rulings since the test cases has a special master or judge found any merit in an allegation that any vaccine can contribute to causing autism.[5]

---

[5]    I am well aware, of course, that during the years since the "test cases" were decided, in two cases involving vaccinees suffering from ASDs, Vaccine Act compensation was granted. But in *neither* of those cases did the Respondent concede, nor did a special master find, that there was any *"causation-in-fact"* connection between a vaccination and the vaccinee's ASD. Instead, in both cases it was conceded or found that the vaccinee displayed the symptoms of a *Table Injury* within the Table time frame after vaccination. (See §300aa-11(c)(1)(C)(i); §300aa-14.)

## III

## PROCEDURAL BACKGROUND

Petitioners Safia Weged and Hussein Hashi ("Petitioners"), on April 22, 2008, filed the "short-form petition" authorized by the *Autism General Order No. 1*, 2002 WL 31696785 (Fed. Cl. Spec. Mstr. July 3, 2002), for compensation under the National Vaccine Injury Compensation Program, on behalf of their minor daughter, S.H.[6]   By filing the short-form petition, Petitioners joined the Omnibus Autism Proceeding ("OAP"), thereby asserting that S.H. has an autism spectrum disorder ("ASD") and that one or more vaccines had caused her condition.  Petitioners did not file any medical records or details regarding S.H.'s injuries with the short-form petition. The case was assigned to Special Master Gary Golkiewicz.

On April 28, 2008, the special master ordered Petitioners to complete their petition by filing the statutorily-required medical records concerning S.H., and a "Statement Regarding Onset," clearly detailing S.H.'s first symptom or manifestation of onset or significant aggravation of her injury.  (ECF No. 5.)  Respondent filed Respondent's "Rule 4(c) report" on

_____

In *Poling v. HHS*, the presiding special master clarified that the family was compensated because the Respondent conceded that the Poling child had suffered a *Table Injury--not* because the Respondent or the special master had concluded that any vaccination had contributed to causing or aggravating the child's ASD. *See Poling v. HHS*, No. 02-1466V, 2011 WL 678559, at *1 (Fed. Cir Spec. Mstr. Jan. 28, 2011) (a fees decision, but noting specifically that the case was compensated as a Table Injury).

Second, in *Wright v. HHS*, No. 12-423, 2015 WL 6665600 (Fed. Cl. Spec. Mstr. Sept. 21, 2015), Special Master Vowell concluded that a child, later diagnosed with ASD, suffered a "Table Injury" after a vaccination.  However, she stressed that she was *not* finding that the vaccinee's ASD in that case was "caused-in-fact" by the vaccination--to the contrary, she specifically found that the evidence in that case did *not* support a "causation-in-fact" claim, going so far as to remark that the petitioners' "causation-in-fact" theory in that case was "absurd." *Wright v. HHS*, No. 12-423, 2015 WL 6665600, at *2 (Fed. Cl. Spec. Mstr. Sept. 21, 2015).

The compensation of these two cases, thus, does *not* afford any support to the notion that vaccinations can contribute to the *causation* of autism.  In setting up the Vaccine Act compensation system, Congress forthrightly acknowledged that the Table Injury presumptions would result in compensation for some injuries that were *not*, in fact, truly vaccine-caused. H.R. Rept. No. 99-908, 18, 1986 U.S.C.C.A.N. 6344, 6359.  ("The Committee recognizes that there is public debate over the incidence of illnesses that coincidentally occur within a short time of vaccination.  The Committee further recognizes that the deeming of a vaccine-relatedness adopted here may provide compensation to some children whose illness is not, in fact, vaccine-related.")

_____

[6]     On April 22, 2008, Petitioners also filed a petition on behalf of their older daughter, O.H. (No. 08-308).

May 20, 2008, noting that Petitioners had yet to file any evidence, so that Respondent could not assess the merits of the claim without the medical records. (ECF No. 9, p. 4.) On September 24, 2010, the special master issued an Order reprimanding Petitioners for failing to file the required evidence in support of their claims. After 2½ years of inactivity, on October 25, 2010, Petitioners filed 17 exhibits of medical records, but did not submit a "Statement Regarding Onset."

By that time, the OAP "test cases," and the appeals thereof, as described in Section II of this Decision above, had concluded. On January 25, 2011, in view of the test case findings of insufficient evidence linking vaccines and autism, Petitioners were ordered to inform the court whether or not they wished to proceed with their claim, or if they wished to exit the Vaccine Program. (ECF No. 20.) Petitioners indicated their intent to proceed, and filed an Amended Petition ("Am. Pet.") on June 29, 2011, alleging that one or more of a series of vaccinations that S.H. had received from 2002 to 2007 "caused or exacerbated progressive encephalopathy with autistic features." (Am. Pet., ECF No. 29, pp. 1-2.)

This case was reassigned to Special Master Denise Vowell on July 1, 2011. During a status conference held on July 20, 2011, she advised Petitioners' counsel that this claim appeared to have been filed outside the Vaccine Act's 36-month statute of limitations. (Order, ECF No. 33, p. 2.)

Between October 2011 and April 2012, Petitioners filed additional exhibits detailing S.H.'s health from birth through early childhood.

On April 11, 2012, Respondent moved to dismiss Petitioners' claim, asserting that the Petition was filed after the expiration of the Vaccine Act's statute of limitations period. (Respondent's Motion to Dismiss, pp. 1, 4–5.) Respondent argued that the first symptoms of S.H.'s autism spectrum disorder (ASD) occurred before the time of her second birthday on November 2, 2004, meaning that the petition was filed more than 36 months after the first symptoms of S.H.'s ASD appeared. (*Id.*, pp. 2–3, 5.)

On July 16, 2012, Petitioners filed an opposition to Respondent's motion to dismiss ("Pet. Opposition"). Petitioners now asserted a new, additional theory of causation, that unspecified vaccinations received by S.H. in 2006 and 2007 "significantly aggravated" S.H.'s pre-existing mitochondrial disorder, and therefore the petition filed on April 22, 2008, was filed within the statute of limitations period as to their new "significant aggravation" claim. (Pet. Opposition, pp. 2, 5.) Subsequently, on September 25, 2013, Petitioners filed a Second Amended Petition, specifying that vaccinations received on *January 8, 2007*, prompted the alleged aggravation. (ECF No. 61-1, p. 2.)

On August 26, 2013, Special Master Vowell dismissed Petitioners' claim that the *initial onset* of S.H.'s autism was vaccine-caused, as untimely filed. *Hashi v. HHS*, No. 08-307V, 2013 WL 10543716 (Fed. Cl. Spec. Mstr. Aug. 26, 2013). However, Petitioners' "significant aggravation" claim remained unresolved. On September 18, 2014, Special Master Vowell convened a hearing to consider testimony in support of Petitioners' significant aggravation claim. On June 1, 2015, she filed a "Ruling on Facts Regarding Significant Aggravation Claim." *Hashi v. HHS*, No. 08-307V, 2015 WL 4626089 (Fed. Cl. Spec. Mstr. June 1, 2015). In that ruling, the special master rejected the Petitioners' contention that the symptoms of S.H.'s

neurodevelopmental disorder worsened significantly in the months following her January 2007 vaccination. *Id*. at *14.

On August 6, 2015, Special Master Vowell issued a dismissal of this case, due to Petitioners' failure to comply with court orders. *Hashi v. HHS*, No. 08-307V, 2015 WL 10458832 (Fed. Cl. Spec. Mstr. Aug. 6, 2015).

This case was reassigned to my docket on August 10, 2015, due to the imminent retirement of Special Master Vowell. (ECF No. 96.)  Petitioners filed a Motion to Vacate Special Master Vowell's dismissal decision, on August 18, 2015. (ECF No. 98.)  On August 20, 2015, I filed an Order denying Petitioners' Motion to Vacate. (ECF No. 99.)  Judgment entered on September 9, 2015, dismissing the petition. (ECF No. 100.)

Petitioners filed a "Petition for Fees and Costs" on February 21, 2016. (ECF. No. 102.) Respondent filed a Response on March 7, 2016. (ECF. No. 103.)  Petitioners did not initially file a reply to Respondent's Response, but on June 29, 2016, they filed a motion seeking to file a late reply.  I granted the request.  After obtaining another extension, they filed a reply on August 5, 2016. (ECF No. 110.)


## IV

## DISCUSSION OF "REASONABLE BASIS" ISSUE

### A.  Introduction

As noted above, Petitioners filed an application for attorneys' fees and costs ("Application") in this case on February 21, 2016, and Respondent filed an opposition ("Opposition") to that motion on March 7, 2016.  In that Opposition, Respondent argued in detail that I should deny *any* award for attorneys' fees and costs in this case, on the ground that there was no "reasonable basis" for filing this case. (Opposition, pp. 4-11.)  Respondent further argued that even if I find a reasonable basis for *filing* the case, I should nevertheless conclude that there was no reasonable basis for *continuing* to pursue the case past June of 2011. (Opposition, p. 11.)

In the following pages I conclude, considering the overall record of this case and the course of the OAP, that there was a reasonable basis for *filing* the petition and pursuing it somewhat past the point where the OAP "test cases" (*see* Section II of this Decision above) became final, but that at a certain point there was *no longer* a reasonable basis to continue pursuing this claim.  Accordingly, I will award no fees and costs incurred beyond that point.

### B.  There was a reasonable basis to file this case, and to pursue the case <u>until</u> it became clear that Petitioners' "initial onset" claim was time-barred.

As set forth above in Section II of this Decision, in the early 2000s major controversies arose as to whether autism spectrum disorders might be caused or otherwise affected by either MMR vaccines or thimerosal-containing vaccines.  Therefore, thousands of parents filed Vaccine Act claims during the early 2000s alleging that their children's ASDs were vaccine-caused.  I and other special masters have generally found that those claims were brought in good faith and

with a reasonable basis.  Further, given the scientific uncertainty at the time, I find that the *filing* of this *particular* petition in 2008, along with thousands like it in the earlier 2000s, was reasonable.  It was further reasonable to keep such claims, including this one, pending until the OAP "test cases" became final in 2010, and for some reasonable period of time thereafter, in order for counsel to digest the complicated science, and to consult with qualified experts to see if a reasonable basis to go forward with the claims could be found.

Accordingly, in this case, I conclude that it was reasonable to file the petition in 2008, given the fact that the autism "test case" rulings had not yet been issued, and to keep the claim pending until after the test case rulings became final in late 2010.  At that point, however, Petitioners' counsel should have carefully studied the test case decisions, along with the medical records of S.H.'s case, to determine whether there was any feasible chance of demonstrating that S.H.'s disorder was caused or aggravated by his vaccinations.  I consider it a close question whether there remained any reasonable basis for Petitioners to continue their case for more than a brief time after the test cases became final, a point at which *most* petitioners in the autism cases voluntarily ended their pursuit of their Vaccine Act claims.

However, there was another uncertainty in the law at that time, as to the issue of timely filing of Vaccine Act petitions.  The pertinent part of the Vaccine Act's statute of limitations states that, in the case of vaccines administered after October 1, 1988, --

> [N]o petition may be filed for compensation under the Program for such injury after the expiration of 36 months after the date of the occurrence of the first symptom or manifestation of onset or of the significant aggravation of such injury***.

§ 300aa-16(a)(2).  In 2010 a panel decision of the Federal Circuit, *Cloer v. HHS*, 603 F.3d 1341 (Fed. Cir. 2010) ("*Cloer I*"), raised a question as to when the 36-month limitations period began to run.  That panel decision was reversed in an *en banc* ruling of that court, *Cloer v. HHS*, 654 F. 3d 1322, 1324-25 (Fed. Cir. 2011) ("*Cloer II*").  The *Cloer II* interpretation became the final, binding ruling on that legal issue, when the Supreme Court denied *certiorari* in the case on April 16, 2012, in *Cloer v. Sebelius*, 132 S. Ct. 1908 (2012).

Therefore, after *Cloer I* was issued in 2010 until *Cloer II* became binding law on April 16, 2012, there existed an open question as to whether Petitioners' "initial onset" claim in this case was time-barred under §300aa-16(a)(2).  I therefore find that it was reasonable for Petitioners to continue to keep their claim alive through April of 2012.

### C. There was no reasonable basis for Petitioners to further pursue their claim after April of 2012.

#### 1. Petitioners' "initial onset" claim

As explained above, on April 16, 2012, the Supreme Court denied a writ of certiorari in *Cloer v. Sebelius*, 132 S. Ct. 1908 (2012).  At that point, it became clear that Petitioners' claim that vaccinations caused the *initial onset* of S.H.'s ASD was time-barred.  Special Master Vowell so ruled, in her Ruling filed on August 26, 2013. (2013 WL 10543716.)  The special master examined the medical records and found clear evidence of S.H.'s ASD *predating* 2005. (*Id*. at *7.)  Because the petition was not filed until April 22, 2008, that meant that any *initial onset*

allegation of Petitioners (which Special Master Vowell called their "causation in fact claim"), was time-barred.

Therefore, as I assess the record of this case, there was *no reasonable basis* for Petitioners to continue to pursue their case after *certiorari* was denied in *Cloer II* after April 16, 2012.  As to Petitioners' "initial onset" claim, it should have been clear to Petitioners' counsel after April 16, 2012, from studying S.H.'s medical records, that Petitioners' "initial onset" claim was time-barred.  As Special Master Vowell later found, S.H.'s medical records show concern that S.H. was experiencing developmental delay as early as May 15, 2003. (2013 WL 10543716, at *7.)  By September 7, 2004, developmental delay was listed as a "diagnosis," and S.H.'s vocabulary was abnormally small. (*Id.*, at *7 and fn. 22.)  Further, a number of medical records indicate that S.H.'s parents became concerned about S.H.'s speech around November 2004. (*Id.* at *7.)  Thus, it was clear that the initial onset of S.H.'s ASD pre-dated the filing of the petition in this case on April 22, 2008, by more than 36 months, so that it was not reasonable to further pursue that claim after April of 2012, requiring Special Master Vowell to file a written ruling on a point not reasonably in dispute.

### 2. Petitioners' alternative "significant aggravation" claim

It was also not reasonable for Petitioners to pursue to an evidentiary hearing their *alternative* claim that vaccines administered on January 8, 2007, "significantly aggravated" a pre-existing mitochondrial disorder, thereby worsening S.H.'s developmental disorder. Petitioners added that alternative claim in their "Opposition to Respondent's Motion to Dismiss," filed on July 16, 2012, and later clarified that vaccinations administered on *January 8, 2007*, caused the aggravation.  Once again, however, if Petitioners' counsel had carefully studied the medical records, counsel would have noted that the affidavit of S.H.'s father, upon which the aggravation claim was based, was *strongly contradicted* by those medical records.  Again, because Petitioners kept pursuing this "aggravation" claim, Special Master Vowell was required to address it in a written ruling, after hearing oral testimony from S.H.'s father (Mr. Hashi) and his niece (Ms. Hashi) at an evidentiary hearing. *Hashi v. HHS*, No 08-307V, 2015 WL 4626089 (Fed. Cl. Spec. Mstr. June 1, 2015).

When Special Master Vowell addressed the issue in her ruling, she firmly concluded that the affidavits and testimony of S.H.'s father and his niece, on which the Petitioners relied, were decidedly outweighed by the medical records. (*Id.* at *7-11, *13-15.)  The special master described in detail how numerous medical records contradicted the allegations of Mr. Hashi and his niece. (*Id.*)  Special Master Vowell summarized that she "found the contemporaneous medical records to be more reliable than the testimony of Mr. and Ms. Hashi." (*Id.* at *14.)  She noted that Mr. Hashi "merely insisted that all of the medical records that conflicted with his testimony were inaccurate," and that Mr. Hashi's "assertions are not supported anywhere in the medical records." (*Id.*)

Thus, in electing to go forward with Petitioners' "significant aggravation" theory, Petitioners' counsel again ignored the medical records, requiring Special Master Vowell to hold

a hearing and write another decision that she should not have had to write.  Clearly, there was no "reasonable basis" to pursue this aggravation claim to a ruling.[7]

On this point, I stress that I am *not* concluding that it is *always* unreasonable in a Vaccine Act case to pursue a theory in which the petitioners' factual claims vary from the medical records.  This actually happens frequently in Vaccine Act cases, and in the large majority of such cases in the past, special masters *have* found a reasonable basis for contesting such issues at an evidentiary hearing.  In this case, however, the divergence between the Petitioners' factual assertions and the facts shown by the medical records was *especially great*, as Special Master Vowell explained, and I concur.  As Special Master Vowell found, "[t]he conflicts between the hearing testimony and the medical records are *profound*." (2015 WL 4626089 at *13, emphasis added.)  Special Master Vowell concluded that Petitioners' factual assertions were "not supported anywhere in the medical records." (2015 WL 4626089 at *14.)  For example, Mr.

---

[7]       Other special masters have reached similar conclusions in other Vaccine Act cases.  The adequacy of an attorney's investigation into the factual basis of a petitioner's claim has been found to be key to determining whether reasonable basis existed for a claim. *Di Roma v. HHS*, No. 90-3277, 1993 WL 496981, at *2 (Fed. Cl. Spec. Mstr. Nov. 18, 1993) ("Case law teaches us that basic inquiries are required prior to the filing of any paper under the Act," citing *Lamb v. HHS*, 24 Cl. Ct. 255, 258–59 (1991)).  Although in the history of the Vaccine Program special masters have tended to be generous in finding a reasonable basis to grant fee awards in unsuccessful cases, that generosity does not extend to situations in which counsel fails to sufficiently investigate the facts underlying the claim, or persists in litigating a case when the evidence is clearly insufficient. *Riley v. HHS*, No. 09–276V, 2011 WL 2036976, at *3 (Fed. Cl. Spec. Mstr. Apr. 29, 2011); see also *Murphy v. HHS*, 30 Fed. Cl. 60, 62 (1993) (affirming denial of attorney's fees where contemporaneous records provided no basis for alleged injury), *aff'd*, 48 F.3d 1236 (Fed. Cir. 1995); *Di Roma*, 1993 WL 496981 at *3 (denying attorney's fees and costs where "[m]inimal research and good sense should have indicated that this case had no basis under the law.")

Further, special masters have held that the reasonableness of a claim must be re-examined at various stages of the proceeding. *Riley*, 2011 WL 2036976, at *8 (admonishing counsel to "ensure that a reasonable basis is present at *every* stage of the case") (emphasis in original).  If a petitioner's efforts to address questions and concerns about a vaccine claim reveal critical deficiencies, dismissal of the petition may be appropriate, and reasonably incurred attorneys' fees and costs, *to that point*, may be awarded. *Stevens v. HHS*, No. 90-221V, 1992 WL 159520, at *3 (Cl. Ct. June 9, 1992), *aff'd* 996 F. 2d 1236 (Fed. Cir. 1993).  In addition, prompt and responsive action by counsel is encouraged in Program proceedings once a claim's serious shortcomings have been identified and the reasonableness of maintaining the claim is called into question. Compare *Riley*, 2011 WL 2036976, at *7-8 (awarding fees when counsel acted quickly in winding down a case after recognizing that it was no longer reasonable to continue), and *Turner v. HHS*, No. 99-544V, 2007 WL 4410030, at *10 (Fed. Cl. Spec. Mstr. Nov. 30, 2007) (awarding partial fees when counsel promptly moved for judgment on the record upon recognizing the deficiencies in the claim), with *Stevens*, 1992 WL 159520, at *3-4 (denying fees when petitioners' counsel "failed to react" to the ample notice provided of the factual shortcomings of the case).

Hashi filed an affidavit stating that following S.H.'s vaccinations on January 8, 2007, S.H. "cried inconsolably," had a "high fever," "could not look at [him]," "could not communicate," "was going in circles," and "became like a robot in her speech." (ECF No. 59-1.) The medical records, in contrast, show that S.H. did not return to her pediatrician until March 23, 2007 (for sinusitis), and that her parents at that visit "did not express any concerns about a vaccine reaction, regression, or behavioral changes." (2015 WL 4626089 at *7; Ex. 11, pp. 7-9.) The special master noted that Mr. Hashi, quite unbelievably, "merely insisted that all of the medical records that conflicted with his testimony were inaccurate." (*Id*. at *14.)

Further, the *circumstances* in which Petitioners' "significant aggravation" contention arose in this case are telling. As explained above, until 2012 Petitioners' sole contention in this case had been that vaccinations caused the "initial onset" of S.H.'s disorder. However, in April of 2012 Respondent pointed out that that claim was untimely filed. Soon thereafter Petitioners advanced, for the first time, their "significant aggravation" claim, pointing to an alleged aggravation after January 2007 vaccinations, which new claim would not be time-barred. In my view, it was unreasonable for Petitioners to advance a new claim, which was *plainly contradicted* by the medical records, merely to avoid immediate dismissal of this case as untimely filed.

Accordingly, I find that this is the *relatively unusual* case in which the Petitioners have advanced a factual claim, in questionable procedural circumstances (*i.e.*, the pending "untimely filing" motion), in which their claim differed so "profoundly" from the medical records that it was simply *unreasonable* for Petitioners to try to keep their case alive by filing a plainly nonmeritorious "significant aggravation" claim.

### 3. Lack of evidence that vaccinations can cause or aggravate ASDs

In Sections IV(C)(1) and (2) of this Decision immediately above, I have explained that Petitioners' counsel in this case continued to pursue two virtually hopeless *factual scenarios* that were plainly contradicted by the medical records. Further, there is another potential (though unnecessary for purposes of deciding this case) reason to find that the continued pursuit of this case past April 2012 was not reasonable. That is, after this case was filed, there occurred the filing of the autism "test case" decisions described in Section II of this Decision. The six extremely lengthy special master decisions in those test cases, followed by three rulings of Judges of this Court plus two unanimous rulings of three-judge panels of the Federal Circuit, made clear in great detail the complete lack of any persuasive evidence that vaccines can cause or aggravate ASDs. As noted above, this case was filed prior to the issuance of those decisions, and thus I am willing to compensate counsel for her *initial* efforts in this case. But I find it very questionable whether it was reasonable for counsel to have *continued* to pursue this case in light of those rulings. Petitioners' reply filed on August 5, 2016, fails to point to any significant evidence in the record of this case to indicate that, even if their claims had been timely filed, Petitioners had any reasonable argument that any of S.H.'s vaccinations *actually caused* any injury to her.

### D.  Summary concerning "reasonable basis"

At the time that this case was filed, there was considerable uncertainty concerning how claims alleging that vaccines could contribute to the causation of autism would fare in this Court, so I have concluded that it was reasonable to file this case and to pursue it for a reasonable amount of time thereafter.  However, as I have set forth in the sections of this Decision immediately above, both of the Petitioners' causation theories were clearly *contradicted* by S.H.'s medical records.  In addition, Petitioners' counsel persisted in pursuing a claim that vaccines could contribute to the causation or aggravation of autism in the face of the "test case" decisions concluding to the contrary.  Therefore, I conclude that Petitioners' case *ceased* to have a reasonable basis after April 16, 2012, and I will award no fees and costs incurred after that date.

# V

## PETITIONERS' ARGUMENTS

In their reply memorandum filed on August 5, 2016 ("Reply"), Petitioners' counsel countered Respondent's arguments concerning "reasonable basis."  I have carefully considered Petitioners' arguments in that regard, and find merit in *some* of them.  I have taken those arguments into account in reaching my findings concerning "reasonable basis" in Section IV of this Decision.

For example, Petitioners argue that it was reasonable to *originally file* the case, and I agree.  Petitioners argue that there was legal uncertainty until 2012 about the timeliness of their "initial onset" claim, and I agree.  As explained above, I find it reasonable for Petitioners to have pursued that "initial onset" claim until April 16, 2012, when the Supreme Court's denial of *certiorari* confirmed the Federal Circuit's *en banc* decision in the *Cloer* case, thus making it clear that Petitioners' petition in this case was filed out-of-time as to their "initial onset" claim.  Accordingly, there certainly was no "reasonable basis" for Petitioners to continue to pursue their "initial onset" claim *after April 16, 2012*.

Petitioners also argue that they had a reasonable basis for pursuing their alternative, "significant aggravation" claim to a decision.  However, I cannot agree.  As explained above, when Special Master Vowell closely examined that claim, she found no merit to it, finding that it was *plainly contradicted* by S.H.'s medical records.  See her "Ruling on Facts Regarding Significant Aggravation Claim." *Hashi v. HHS*, No. 08-307V, 2015 WL 4626089 (Fed. Cl. Spec. Mstr. June 1, 2015).  In that ruling, the special master strongly rejected the Petitioners' contention that the symptoms of S.H.'s neurodevelopmental disorder worsened significantly in the months following her January 2007 vaccination. (*Id.* at *14.)

Specifically, when Special Master Vowell addressed the issue in her ruling, she firmly concluded that the affidavits and testimony of S.H.'s father and his niece, on which the Petitioners relied, were decidedly outweighed by the medical records. (*Id*. at *8 -*15.)  The special master described in detail how numerous medical records contradicted the allegations of Mr. Hashi and his niece. (*Id*.)  Special Master Vowell summarized that she "found the contemporaneous medical records to be more reliable than the testimony of Mr. and Ms. Hashi."

(*Id*. at *14.)  She stated that "[t]he conflicts between the hearing testimony and the medical records are *profound*." (*Id*. at *13, emphasis added.)  She noted that Mr. Hashi "merely insisted that all of the medical records that conflicted with his testimony were inaccurate," and that Mr. Hashi's "assertions are not supported anywhere in the medical records." (*Id*.)

Thus, in electing to go forward to an evidentiary hearing concerning Petitioners' "significant aggravation" theory, Petitioners' counsel unreasonably ignored the medical records. Clearly, there was no "reasonable basis" to pursue this aggravation claim to a ruling.

Concerning this point, Petitioners' counsel points to the fact that Special Master Vowell "herself agreed to and ordered the hearing." (Reply, p. 17.)  But the fact that Special Master Vowell agreed to conduct a hearing, requested by Petitioners, concerning Petitioners' "significant aggravation" claim, does *not* mean that there was a reasonable basis for Petitioners to request and pursue that hearing.  When a petitioner's counsel requests a hearing concerning an issue, representing to the special master that there is a reasonable basis for the petitioner's position concerning the issue, the special master usually cannot know *ahead of the time of the hearing* whether there is, in fact, a reasonable basis for the claim to be presented at the hearing. In this case, it was only after studying the medical records at around the time of the hearing, and comparing those records to the testimony of the Petitioners' fact witnesses at the hearing, that Special Master Vowell could make a determination concerning the issue.  It was not the special master, but *Petitioners' counsel*, as an officer of the court, who had the duty in this case to carefully study the medical records, to see to what extent they either corroborated or contradicted her witnesses' factual claims, *before requesting* to take this claim to an evidentiary hearing. Counsel *should have known* how thoroughly the records contradicted her clients' claims. Counsel *should have known* that S.H.'s father's only response to the contradictory records would be to assert, quite unbelievably, that every one of the records was simply "inaccurate."  In light of Special Master Vowell's factual conclusions, and my own examination of the record, which confirms those conclusions, it is plain to me that Petitioners did *not* have an objectively "reasonable basis" to seek the evidentiary hearing on the "significant aggravation" claim.

In other words, I have reached the conclusions concerning "reasonable basis" set forth in Section IV above, after carefully considering the arguments of Petitioners' counsel in her reply memorandum.


# VI

## NOTATION CONCERNING "REASONABLE BASIS" IN AUTISM CASES IN GENERAL

As discussed above in Section II of this Decision, in the early 2000s controversies arose concerning whether autism spectrum disorders might be caused or affected by vaccines.  Thus, thousands of Vaccine Act claims were filed during those years alleging that ASDs were vaccine-caused.  These claims were certainly brought in good faith.  Further, in light of the scientific uncertainty at the time, I find that the *filing* of those petitions was reasonable.  It was also reasonable to keep such claims pending until the OAP "test cases" became final in 2010, and for

some period of time thereafter, in order for counsel for each petitioner to digest the complicated science, and to consult with experts to see if a reasonable basis to go forward could be found.

However, by the end of 2010, the two major theories concerning vaccine-causation of autism had been thoroughly considered and rejected in the OAP test cases, with opinions that, among other things, found that *all* of the many reputable epidemiological studies had found *no association* between any vaccines and autism.  At that point, the vast majority of the approximately 5,000 autism petitioners elected either to withdraw their claims, or to request that the special master enter a decision denying their claim on the written record.  Only a small minority of the autism petitioners elected to continue to pursue their cases, seeking other causation theories and/or other expert witnesses.  Since 2010, a number of such cases have gone to trial or decisions on the record before special masters, and in the cases of this type decided thus far, all have resulted in *rejection* of petitioners' claims that vaccines played a role in causing or aggravating their child's ASD.  *See* the cases cited above in Section II.

There is now, therefore, a serious question concerning whether it is reasonable for additional Vaccine Act petitioners to continue to pursue highly speculative theories concerning vaccinees with autism spectrum disorders.  In each such case, of course, a case-specific decision must be made concerning if and when it became unreasonable, under all the circumstances of the case, to continue to go forward.  In many of the cases that have been pursued to a decision since 2010, as in this case, petitioners have tried to avoid the conclusions of the test cases by alleging that a child suffered a vaccine-caused "encephalopathy" that resulted in "autistic-like features," or that a child had an underlying "mitochondrial disorder" that somehow made the child more vulnerable to injuries by vaccines.  But such cases, in essence, have amounted to attempts to prove that vaccines can cause or aggravate *symptoms of ASDs*.  And, except for the two highly unusual Table Injury cases described at footnote 5 above, all such theories have been *rejected*.

Further, a review of the post-test case decisions enumerated in Section II above demonstrates that those cases typically involved expert witnesses who were quite underqualified to opine on the vaccine-causation issues at hand, and/or presented theories with no substantial scientific merit, and/or disregarded the facts contained in the medical records of the case.

Accordingly, I hereby put counsel on notice, once again, especially in autism-related cases, that if counsel continue to go forward with such extremely weak cases, I am *not* likely to find that there was a reasonable basis for their continued prosecution of the case.

# VII

## CALCULATION OF FEES AND COSTS AWARDED

### A.  *Hourly rates*

Attorney Sharp has practiced law since 1989. (Ex. 23, ECF No. 102-2.)  In this case, she generally seeks compensation at hourly rates of $350 for 2008 and 2009, $360 for 2010 and

2011, and $370 for 2012.[8]  I find those rates reasonable. (Ex. 22, ECF 102-1, pp. 1-23.) *See McCulloch v. HHS*, No. 09-293V, 2015 WL 5634323 (Fed. Cl. Spec. Mstr. Sep. 1, 2015), at *19.

Ms. Sharp also seeks hourly rates of $120 for paralegal work performed in 2011, and $125 for paralegal work performed in 2012. (Ex. 22, pp. 16-17, 19.)  I find those rates reasonable as well.

## B.  Hours compensated

As explained above, I have determined to compensate Ms. Sharp for the hours that she billed for herself and her paralegal for 2008 through 2011, and for 2012 through April 16.  My analysis of her Ex. 22 indicates that she billed 5.05 hours for 2008 and 2009 (Ex. 22, pp. 1-4), 18.15 hours for 2010 and 2011 (*id.*, pp. 4-19), and 9.2 hours in 2012 prior to April 16 (*id.*, pp. 19-23).

## C.  Costs

I will compensate Petitioners for the miscellaneous attorney costs, all of which were incurred before April 2012, a total of $1,809.72. (Ex. 26, ECF No. 102-5.)  I will also compensate Petitioners in the amount of $845 for the services of Dr. Marcel Kinsbourne, consulted as an expert witness. (ECF Nos. 102, 107.)  Further, I will compensate the $359.45 in costs incurred by Petitioners themselves. (Ex. 27, ECF No. 102-6.)

## D.  Summary of fees and costs awarded

| | | | |
|---|---|---|---|
| • | Attorney hours 2008-09, 5.05 hours times $350 | = | $ 1,767.50 |
| • | Attorney hours 2010-11, 18.15 hours times $360 | = | 6,534.00 |
| • | Attorney hours 2012, 9.2 hours times $370 | = | 3,404.00 |
| • | Paralegal hours 2011, 0.75 hours times $120 | = | 90.00 |
| • | Paralegal hours 2012, 0.25 hours times $125 | = | 31.25 |
| • | Dr. Kinsbourne | = | 845.00 |
| • | Other attorney's costs | = | 1,809.72 |
| | Attorney's fees and costs subtotal | $ | 14,481.47 |
| • | Petitioners' costs | = | 359.45 |
| | Total award | $ | 14,840.92 |

---

[8]      For a few isolated time entries, Ms. Sharp listed an hourly rate of $400, without explanation.  For all hours worked in 2008 through 2012, however, I will utilize the hourly rates set forth above.

## VIII

### CONCLUSION

For the foregoing reasons, I award Petitioners a total of $14,840.92 in attorneys' fees and costs. A check for $359.45 shall be made payable to Petitioners. The other $14,481.47 shall be paid in the form of a check payable jointly to Petitioners and Petitioners' counsel. The Clerk of this Court shall enter judgment accordingly.

<u>/s/ George L. Hastings, Jr.</u>
George L. Hastings, Jr.
Special Master